Emily A. Nugent, Esq., State Bar No. 255048
EMILY NUGENT LAW
935 Moraga Road, #200
Lafayette, CA 94549
Tel.: (510) 371-4456
E-Mail: emily@emilynugentlaw.com

Pro Hac Vice Pending:

Andrea Fischer, Florida Bar #1000345
Audrey Schechter, of counsel, Florida Bar #962589
FISCHER LEGAL GROUP
1740 Broadway, Suite 1500
New York, New York 10019
Tel: (212) 577-9231
E-mail: afischer@fischerlegalgroup.com
E-Mail: audreyschechterlaw@gmail.com

UNDERSEAL

FILED #99
pa
np

FEB 12 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNDERSEAL

Attorneys for Plaintiff-Relator

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CV 19 0765 DMR

UNITED STATES OF AMERICA
*ex rel.* JEFFREY MENDELSSOHN,
and STATE OF CALIFORNIA *ex rel.*
JEFFREY MENDELSSOHN,

    PLAINTIFFS/RELATOR,

- against -

PORIFERA INC., a Delaware corporation,
OLGICA BAKAJIN, a California resident,
and JEFF JENSEN, a California resident.

    DEFENDANTS.

Civ. No.

**COMPLAINT FOR DAMAGES**

FILED **UNDER SEAL** AND *IN CAMERA*
PURSUANT TO 31 U.S.C. § 3730(b)

**JURY TRIAL DEMANDED**

Plaintiffs, the United States of America and the State of California *ex rel.* Jeffrey Mendelssohn, by and through relator's counsel Fischer Legal Group, LLC and Emily Nugent Law, allege for their *qui tam* complaint as follows.

## I.  PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.  This is a civil action brought by Relator Jeffrey Mendelssohn ("Relator" or "Mendelssohn"), on his own behalf and on behalf of the United States of America ("United States") and the State of California ("California") against Porifera, Inc., ("Porifera"), Olgica Bakajin ("Bakajin"), and Jeff Jensen ("Jensen") (collectively, Porifera, Bakajin, and Jensen are known as Defendants") under 31 U.S.C. §§ 3729 *et seq.* (the "Federal False Claims Act") and Cal. Gov't Code § 12651 *et seq.* (the "California False Claims act") to recover damages sustained by, and penalties owed to, the United States and California as a result of Defendants' false and fraudulent billing to federal and state government departments and agencies in conjunction with government contracts Porifera enjoyed with, *inter alia*, the United States Department of Defense ("DOD"), the United States Department of Energy ("DOE"), the National Science Foundation ("NSF"), and the California Energy Commission ("CEC")(collectively, the "Government Projects").

2.  These false and fraudulent billings were in the nature of billing the Government Projects for work Porifera employees did not perform.  Defendant Bakajin instructed employees to bill time to the Government Projects in excess of the time they actually spent on those projects, or in many instances, billing to those projects when they had not worked on them at all.

## II.  PARTIES

3.  Plaintiffs are the United States of America, on behalf of its departments, the United States Department of Defense, and the United States DOE; and its agency, the National

Science Foundation; and the State of California, on behalf of its agency, the California Energy Commission.

     4.     Defendant Porifera is a foreign corporation, registered in Delaware, with business address of 1575 Alvarado Street, San Leandro, CA 94577. Porifera develops clean water technology.

     5.     Defendant Bakajin was at all times relevant an individual residing in California. At all times relevant, she has served as the CEO and owner of Porifera.

     6.     Defendant Jensen was at all times relevant an individual residing in California. He serves as the chairman of the board of Porifera.

     7.     Relator Mendelssohn was at all times material an individual residing in California. He was an employee of Porifera from 2010 through 2018.

## III.    JURISDICTION AND VENUE

     8.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

     9.     Under 31 U.S.C § 3730(e), there has been no public disclosure of the allegations or "transactions" in this Complaint.

     10.     This Court has personal jurisdiction and venue over the Defendants because, among other things, Defendants transact business in this District, and engaged in the wrongdoing alleged in this complaint in this District.

     11.     Venue is proper in this District under 31 U.S.C § 3732(a), 28 U.S.C. § 1391(b) and (c). Defendants transact business within this District, and the acts proscribed by 31 U.S.C § 3729 occurred in this District.

12.     Relator is an original source of the allegations in this Complaint and the allegations in the Complaint are not based upon publicly disclosed information.  This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

13.     To the extent that there has been a public disclosure, the Relator is an original source under 31 U.S.C. §3730(e)(4).  He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

## IV.    APPLICABLE LAW

### A.    Federal False Claims Act

14.     The False Claims Act, specifically 31 U.S.C. § 3729(a)(1) and (2), as amended, 31 U.S.C. § 3729(a)(1)(A), (B) & (G), imposes liability upon any person who:  "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement to get false or fraudulent claims paid or approved;" or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government."  Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

15.     The Federal False Claims Act imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and "no proof of specific intent to defraud is required."  31 U.S.C. § 3729, as amended, 31 U.S.C. §3729(b) (1) (A) & (B).  The Federal False

Claims Act broadly defines a "claim" as including "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

**B.    The California State False Claims Act**

16.    The California State False Claims Act provides, in pertinent part, that:

(a) Any person who commits any of the following enumerated acts in this subdivision shall have violated this article and shall be liable to the state or to the political subdivision for three times the amount of damages that the state or political subdivision sustains because of the act of that person. A person who commits any of the following enumerated acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the state or political subdivision for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101–410 Section 5, 104 Stat. 891, note following 28 U.S.C. Section 2461.

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of this subdivision.

(4) Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less than all of that property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8) Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

California Government Code, Title 2, Div. 3, Part 2, Ch. 6, Article 9, Section 12651.

## C.   Grant Regulations

**Federal Grants**

17.   2 CFR 200 *et seq* sets forth the requirements for receipt of DOE grants.

18.     2 CFR 200.69 defines "non-federal entity" as: "a state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization that carries out a Federal award as a recipient or subrecipient."

19.     2 CFR §200.201 (b)(3) provides:

The non-Federal entity must certify in writing to the Federal awarding agency or pass-through entity at the end of the Federal award that the project or activity was completed or the level of effort was expended. If the required level of activity or effort was not carried out, the amount of the Federal award must be adjusted.

20.     2 CFR §200.208 provides:

Unless prohibited by Federal statutes or regulations, each Federal awarding agency or pass-through entity is authorized to require the non-Federal entity to submit certifications and representations required by Federal statutes, or regulations on an annual basis. Submission may be required more frequently if the non-Federal entity fails to meet a requirement of a Federal award.

21.     2 CFR §200.300 (b) provides:

The non-Federal entity is responsible for complying with all requirements of the Federal award. For all Federal awards, this includes the provisions of FFATA, which includes requirements on executive compensation, and also requirements implementing the Act for the non-Federal entity at 2 CFR part 25 Financial Assistance Use of Universal Identifier and System for Award Management and 2 CFR part 170 Reporting Subaward and Executive Compensation Information. See also statutory requirements for whistleblower protections at 10 U.S.C. 2409, 41 U.S.C. 4712, and 10 U.S.C. 2324, 41 U.S.C. 4304 and 4310.

22.     2 CFR §200.302

(b) The financial management system of each non-Federal entity must provide for the following (see also §§200.333 Retention requirements for records, 200.334 Requests for transfer of records, 200.335 Methods for collection, transmission and storage of information, 200.336 Access to records, and 200.337 Restrictions on public access to records):

*****

(2) Accurate, current, and complete disclosure of the financial results of each Federal award or program in accordance with the reporting requirements set forth in §§200.327 Financial reporting and 200.328 Monitoring and reporting program performance. If a Federal awarding agency requires reporting on an accrual basis from a recipient that

7

maintains its records on other than an accrual basis, the recipient must not be required to establish an accrual accounting system. This recipient may develop accrual data for its reports on the basis of an analysis of the documentation on hand. Similarly, a pass-through entity must not require a subrecipient to establish an accrual accounting system and must allow the subrecipient to develop accrual data for its reports on the basis of an analysis of the documentation on hand.

(3) Records that identify adequately the source and application of funds for federally-funded activities. These records must contain information pertaining to Federal awards, authorizations, obligations, unobligated balances, assets, expenditures, income and interest and be supported by source documentation.

(4) Effective control over, and accountability for, all funds, property, and other assets. The non-Federal entity must adequately safeguard all assets and assure that they are used solely for authorized purposes. See §200.303 Internal controls.

(5) Comparison of expenditures with budget amounts for each Federal award.

*****

(7) Written procedures for determining the allowability of costs in accordance with Subpart E—Cost Principles of this part and the terms and conditions of the Federal award.

23.     2 CFR §200.303 provides:

  The non-Federal entity must:

    (a) Establish and maintain effective internal control over the Federal award that provides reasonable assurance that the non-Federal entity is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States or the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

    (b) Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards.

    (c) Evaluate and monitor the non-Federal entity's compliance with statutes, regulations and the terms and conditions of Federal awards.

(d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(e) Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or the non-Federal entity considers sensitive consistent with applicable Federal, state, local, and tribal laws regarding privacy and obligations of confidentiality.

24.     2 CFR §200.309 provides, in part:

A non-Federal entity may charge to the Federal award only allowable costs incurred during the period of performance (except as described in §200.461 Publication and printing costs) and any costs incurred before the Federal awarding agency or pass-through entity made the Federal award that were authorized by the Federal awarding agency or pass-through entity.

25.     2 CFR §200.328(a) provides:

*Monitoring by the non-Federal entity.* The non-Federal entity is responsible for oversight of the operations of the Federal award supported activities. The non-Federal entity must monitor its activities under Federal awards to assure compliance with applicable Federal requirements and performance expectations are being achieved. Monitoring by the non-Federal entity must cover each program, function or activity. See also §200.331 Requirements for pass-through *entities.*

26.     2 CFR §200.400 provides, in part:

The application of these cost principles is based on the fundamental premises that:

(a) The non-Federal entity is responsible for the efficient and effective administration of the Federal award through the application of sound management practices.

(b) The non-Federal entity assumes responsibility for administering Federal funds in a manner consistent with underlying agreements, program objectives, and the terms and conditions of the Federal award.

(c) The non-Federal entity, in recognition of its own unique combination of staff, facilities, and experience, has the primary responsibility for employing whatever form of sound organization and management techniques may be necessary in order to assure proper and efficient administration of the Federal award.

9

COMPLAINT

(d) The application of these cost principles should require no significant changes in the internal accounting policies and practices of the non-Federal entity. However, the accounting practices of the non-Federal entity must be consistent with these cost principles and support the accumulation of costs as required by the principles, and must provide for adequate documentation to support costs charged to the Federal award.

27.    2 CFR §200.403 provides factors regarding allowability of costs as follows:

Except where otherwise authorized by statute, costs must meet the following general criteria in order to be allowable under Federal awards:

(a) Be necessary and reasonable for the performance of the Federal award and be allocable thereto under these principles.

(b) Conform to any limitations or exclusions set forth in these principles or in the Federal award as to types or amount of cost items.

(c) Be consistent with policies and procedures that apply uniformly to both federally-financed and other activities of the non-Federal entity.

(d) Be accorded consistent treatment. A cost may not be assigned to a Federal award as a direct cost if any other cost incurred for the same purpose in like circumstances has been allocated to the Federal award as an indirect cost.

(e) Be determined in accordance with generally accepted accounting principles (GAAP), except, for state and local governments and Indian tribes only, as otherwise provided for in this part.

(f) Not be included as a cost or used to meet cost sharing or matching requirements of any other federally-financed program in either the current or a prior period. See also §200.306 Cost sharing or matching paragraph (b).

(g) Be adequately documented. See also §§200.300 Statutory and national policy requirements through 200.309 Period of performance of this part.

28.    2 CFR 200.405 provides for what costs are allocable costs, as follows:

(a) A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received. This standard is met if the cost:

(1) Is incurred specifically for the Federal award;

10

COMPLAINT

(2) Benefits both the Federal award and other work of the non-Federal entity and can be distributed in proportions that may be approximated using reasonable methods; and

(3) Is necessary to the overall operation of the non-Federal entity and is assignable in part to the Federal award in accordance with the principles in this subpart.

(b) All activities which benefit from the non-Federal entity's indirect (F&A) cost, including unallowable activities and donated services by the non-Federal entity or third parties, will receive an appropriate allocation of indirect costs.

(c) Any cost allocable to a particular Federal award under the principles provided for in this part may not be charged to other Federal awards to overcome fund deficiencies, to avoid restrictions imposed by Federal statutes, regulations, or terms and conditions of the Federal awards, or for other reasons. However, this prohibition would not preclude the non-Federal entity from shifting costs that are allowable under two or more Federal awards in accordance with existing Federal statutes, regulations, or the terms and conditions of the Federal awards.

(d) Direct cost allocation principles. If a cost benefits two or more projects or activities in proportions that can be determined without undue effort or cost, the cost must be allocated to the projects based on the proportional benefit. If a cost benefits two or more projects or activities in proportions that cannot be determined because of the interrelationship of the work involved, then, notwithstanding paragraph (c) of this section, the costs may be allocated or transferred to benefitted projects on any reasonable documented basis. Where the purchase of equipment or other capital asset is specifically authorized under a Federal award, the costs are assignable to the Federal award regardless of the use that may be made of the equipment or other capital asset involved when no longer needed for the purpose for which it was originally required. See also §§200.310 Insurance coverage through 200.316 Property trust relationship and 200.439 Equipment and other capital expenditures.

(e) If the contract is subject to CAS, costs must be allocated to the contract pursuant to the Cost Accounting Standards. To the extent that CAS is applicable, the allocation of costs in accordance with CAS takes precedence over the allocation provisions in this part.

29.    2 CFR §200.410 directs what happens to unallowable costs, as follows:

Payments made for costs determined to be unallowable by either the Federal awarding agency, cognizant agency for indirect costs, or pass-through entity, either as direct or indirect costs, must be refunded (including interest) to the Federal Government in accordance with instructions from the Federal agency that determined the costs are unallowable unless Federal statute or regulation

11

COMPLAINT

directs otherwise. See also Subpart D—Post Federal Award Requirements of this part, §§200.300 Statutory and national policy requirements through 200.309 Period of performance.

30.   2 CFR §910.350 provides that 2 CFR part 200 applies to DOE grants. Specifically, subsection (a) provides:

> As stated in 2 CFR 910.122, unless otherwise noted in part 910, the definition of Non-Federal entity found in 2 CFR 200.69 is expanded for DOE to include for-profit organizations in addition to states, local governments, Indian tribes, institutions of higher education (IHE), and nonprofit organizations.

31.   Similarly, 2 CFR §1103.100 provides that 2 CFR part 200 applies to Department of Defense grants.

32.   The National Science Foundation (NSF) is governed by the National Science Foundation Act of 1950, as amended (42 U.S.C. 1861-75, our "Organic Act" or the "NSF Act") and other statutes, such as the Science and Engineering Equal Opportunities Act and various permanent ("codified") sections of legislation authorizing and making appropriations to the Foundation.

33.   42 U.S.C. §1862 (b) authorizes the National Science Foundation to issue grants in furtherance of its purpose.

34.   Pursuant to 2 CFR §2500-100, the NSF formally adopts 2 CFR part 200, implementing the federal grant administrative requirements, cost principles and audit requirements for federal awards.

35.   At https://www.grants.gov/web/grants/learn-grants/grant-fraud/grant-fraud-responsibilities.html the federal government sets forth various responsibilities for grant recipients.  Those include:

- Grant recipients are stewards of federal funds
- Grant dollars must be used for their intended purpose

12

COMPLAINT

1          • Grant recipients must account for costs and justify expenditures.

2          36.     Further, the responsibilities page also notes that "[u]sing federal grant dollars for

3    unjust enrichment, personal gain, or other than their intended use is a form of theft, subject to

4    criminal and civil prosecution under the laws of the United States."  Actions of grant fraud

5    include false statements and false claims.  Examples include, but are not limited to,

6          • Charging personal expenses as business expenses against the grant
7          • Charging for costs which have not been incurred or are not attributable to the
             grant
8          • Charging for inflated labor costs or hours, or categories of labor which have not
9             been incurred...

10   https://www.grants.gov/web/grants/learn-grants/grant-fraud/grant-fraud-responsibilities.html,

11   pages 1 and 2.

12   **California Energy Commission**

13         37.     . The CEC provides grants to businesses to develop clean energy technology

14   through "EPIC".  "EPIC means the Electric Program Investment Charge, an electricity ratepayer-

15   funded surcharge authorized by the California Public Utilities Commission in December 2011."

16   EPIC Standard Grant Terms, Exhibit C, Page 29 of 31, paragraph 25.

17

18         38.     The CEC utilizes standard agreements with its grant recipients.  *See, e.g.,*

19   https://www.energy.ca.gov/contracts/epic_terms_segmented/EPIC_Standard_Contract_Terms.pd

20   f

21         39.     The CEC entered into such grant agreements with Porifera on or about December

22   26, 2014; on or about August 3, 2016; and on or about August 8, 2018.  Among other things, the

23   grant agreements set forth the terms and conditions of payment.  Specifically, the agreements

24   each provide:

25

26

27                                        13

28                                   COMPLAINT

Conditions for Payment

1) **Actual, allowable expenses:** The Recipient may only bill for actual expenses incurred at its actual direct labor, fringe benefit, and indirect rates, not to exceed the maximum rates specified in the budget. See subsection (b) for a discussion of allowable and unallowable costs.

EPIC Standard Grant Terms, Exhibit C, page 8 of 31, paragraph 8 a. 1).

40.    The grant terms also direct the following:

c. Payment Request Format
Each request for payment will consist of, but not be limited to, the following:

1) An invoice that includes a list of actual expenses incurred during the billing period, up to any budget rate caps. The Recipient may only bill the lower of actual rates or budget rate caps. Backup documentation is required at the time of invoice submittal. Unless otherwise specified in Exhibit B or the invoice template, the invoice must include the following:

*****

e) Recipient's actual labor expenditures, including hourly unloaded labor rates by individual name and classification, hours worked, and benefits (fully loaded rates may only be used if they are included in the grant budget);

EPIC Standard Grant Terms, Exhibit C, page 10 of 31, paragraph 8. c.

41.    The grant terms mandate an executed certification as follows:

The following certification will be included on each payment request form and signed by the Recipient's authorized officer:

*The documents included in this request for payment are true and correct to the best of my knowledge and I, as an agent of [Company Name] have authority to submit this request. I certify that reimbursement for these costs has not and will not be received from any other sources, including but not limited to a government entity contract, subcontract, or other procurement method.*

EPIC Standard Grant Terms, Exhibit C, page 11 of 31, paragraph 8. d.

42.    The agreement also provides for situations where the CEC has overpaid the recipient (in this case, Porifera), as follows:

Refund to the Energy Commission

If the Energy Commission determines that any invoiced and paid amounts exceed the actual allowable incurred costs, the Recipient will repay the amounts to the Energy

14

COMPLAINT

1  Commission within thirty (30) days of request or as otherwise agreed by the Energy
   Commission and the Recipient.

2  EPIC Standard Grant Terms, Exhibit C, page 15 of 31, paragraph 11 d.

3
   43.     The terms also require the recipient to comply with "all applicable federal, state
4
   and local laws, rules and regulations."  EPIC Standard Grant Terms, Exhibit C, Page 27 or 31,
5
6  paragraph 24 a.

7  **V.     ALLEGATIONS**

8      **The Fraud**

9      44.     Relator started working at Porifera in 2010, in the position of Vice President,
10
   Business Development and Administration.  He was employed in that capacity until his
11
   termination on July 30, 2018.
12
13     45.     Beginning in 2009, Porifera was awarded various government grants to

14 investigate clean water options.[1]

15
   _____
16 [1] A reverse chronology of those grants is as follows:
   August 2018
17 Issued California Energy Commission Notice of Proposed Award for Energy and Water Savings
   in Food and Beverage Wastewater Reuse (~$1,777,000)
18
19 August 2018
   Issued California Energy Commission Notice of Proposed Award for Energy Savings at
20 Wineries through Osmotic Control of Brix and Alcohol (~$2,061,000)

21 May 2018
   Awarded Phase 1 Department of Energy SBIR grant to investigate an efficient PFO-SPS System
22 for Concentration of Brines and Wastewater Using Low Enthalpy Geothermal Heat (~$149,000)
   DE-SC0018870
23
24 August 2017
   Awarded Phase 2B, Department of Energy, SBIR Grant to investigate use of FO for treating
25 wastewater and capturing CO2 at thermal power plants (~$499,000)

26

27              15
28

August 2016
Awarded California Energy Commission Grant to test a low-energy water treatment system for fail-safe direct potable reuse. (~$1,000,000)

August 2016
Awarded Phase 2, Department of Energy, SBIR Grant to investigate use of FO for treating wastewater and capturing CO2 at thermal power plants (~$999,000)

June 2015
Awarded California Energy Commission Grant for advanced wastewater treatment using forward osmosis to produce high quality water. (~$3,230,000)

June 2015
Awarded California Energy Commission Grant for demonstration of forward osmosis to produce Juice Concentrate, Purify and Reuse Wastewater and Reduce Energy Use. (~$2,500,000)

May 2013
Awarded Phase 1 Department of Energy SBIR Grant to investigate use of FO for treating wastewater and capturing CO2 at thermal power plants. (~ $150,000)

Jan 2013
NSF SBIR Phase 1 Award for CNT-Ultrafiltration membrane development. ($150,000)

Feb 2012
NASA SBIR Phase 1 Award for forward osmosis element demonstration. ($118,000)

Nov 2011
National Science Foundation Phase 2 Award for CNT FO membrane development. ($497,000 for Phase 2,\;  $150,000 for Phase 1)

Jul 2011
DARPA Phase 2 Award from the DOD for
advanced desalination system. (~$6,380,000)

Mar 2010
ARPA-E Award from the DOE for CO2 gas sequestration using CNT membranes. ($1,100,000 from ARPA-E and $115,000 from State of California)

Sep 2009
Phase 1 STTR Award for CNT FO membrane development. ($150,000)

Jul 2009
DARPA Phase 1 Award from the Department of Defense for
advanced desalination system. ($3,495,000)

46.     Bakajin directed all employees to complete paper timesheets.  The timesheets covered a semi-monthly pay period (two times per month).  Relator's position included distributing, collecting and tabulating time sheets from 2010 until shortly after Silvana Shepard was hired as Comptroller in November 2017.

47.     Porifera had three main groupings of projects: commercial projects, government projects and internal/indirect/overhead.

48.     Notably, from 2010-2015, Porifera was heavily engaged in research and development, and relied on government grants to continue as a going concern.

49.     The projects relevant to this lawsuit are as follows.

| Government Agency | Contract Start | Contract End | Award Amount | Award No. |
|---|---|---|---|---|
| Department of Defense "DARPA" "MANTRA" | 07/27/2009 | 05/31/2013 | $9,676,645 | DE-AR0000025 |
| Department of Energy "DOE" "ARPA-E" | 03/01/2010 | 04/31/2013 | $1,153,974.93 | W911NF-09-C-0079 |
| National Science Foundation "NSF SBIR" | 04/01/2010 | 09/30/2015 | $1,115,603 | IIP-1058572 |
| Department of Energy "DOE NETL Grant" | 10/01/2014 | 03/31/2016 | $500,000 | DE-FE0020240 57 |
| Department of Energy "DOE P1P2 Grant" | 06/01/2013 | 07/31/2018 | $2,146,956 | DE-SC0010264 |
| California Energy Commission ("CEC Concentrator Grant") | 06/30/2015 | 03/29/2019 | $2,499,289 | EPC-14-065 |
| California Energy Commission ("CEC Recycler Grant") | 06/30/2015 | 03/29/2019 | $3,230,420 | EPC-14-063 |
| California Energy | 08/31/2016 | 08/30/2019 | $999,795 | EPC-16- |

$23,805,000 in Total Federal and State Awards.

| Commission ("CEC DPR Grant" | | | | 009 |
|---|---|---|---|---|

50.     The timesheets contained boxes separated by projects and dates in which the employees were supposed to enter their time.

51.     In furtherance of his position and to ease the tabulation of the employees' time, on or about February 26, 2010, Relator created an excel spreadsheet, entitled "2009-2010 Labor Distribution & Payroll Entry," identifying time by employee and project.  Relator continued to document this information throughout his tenure at Porifera, and created similar spreadsheets for the years 2012, 2013, 2014, 2015, 2016, 2017, and 2018.

**The Initial Fraud**

52.     Bakajin often returned employee's original timesheets to them to revise and increase the amount of time indicated in certain Government Projects, regardless of whether the employees spent any time at all on the project.

53.     Bakajin directed all employees about how to allocate their time.  The senior employees listed below, due to their employment level and tenure, had the most significant impact on billing by virtue of their revised time allocation to the Government Projects.

        a.   Iljuhn Roh

        b.   Relator

        c.   Jennifer Klare

        d.   Ravindra Revanur

        e.   Charles Benton

        f.   Erik Desomeaux

        g.   Silvana Shepard

h.   Valentyn Lulevich

54.     Bakajin handed out allocation slips on which she would indicate what percentage of time an employee should designate per project on his or her timeslip (the "Allocation Slips").

55.     The Porifera Timekeeping Notice for Employees instructed employees as follows:

1)   employees are to complete their own timesheet, at least on a daily basis,
2)   corrections are to be notated on the timesheet with a relevant explanation, and
3)   Supervisors (*i.e.*, Olgica Bakajin) are to assure that the employees are working on direct or indirect effort and sign off on the timesheet.

56.     This timekeeping notice, however, was not followed.  It was not just ignored, but rather, Bakajin told employees to act in direct contradiction to the written directive – billing their time to projects per the Allocation Slips, and not based on their work load.

57.     Bakajin used numerous approaches to falsify the time records.

58.     From 2010-2016, Bakajin handed each employee a printed slip of paper containing the Allocation Slip, which she generated from a spreadsheet she constructed. She told the employees that the Allocation Slips pertained to budgeting issues.  The Allocation Slip set forth percentage allocations for the employee to allocate his or her hours on the timesheet, regardless of the amount of time actually spent on a project.

59.     Often, she would hand out the Allocation Slip toward the end of the time-period, or after the time-period, and employees would then fill out their timesheets based on Bakajin's allocations. In other words, if an employee worked 50 hours per week, that employee would then allocate those hours worked to projects based on the percentages contained in Bakajin's Allocation Slip, rather than the actual time spent on that particular project.

60.     Employees relied on Bakajin's Allocation Slips for inputting their hours into their timesheets. Frequently, when Relator asked an employee for his or her timesheet, the response was that they could not complete it because Bakajin had not given them their Allocation Slip and they did not know how to allocate their hours.

61.     Relator encouraged employees to complete their timesheets on a daily basis. Bakajin did not, and resisted when Relator made this an issue. Relator sent out successive reminders over a series of weeks before many of the employees would provide him with their timesheets, delaying government billing sometimes by months.

**Invoicing Fraud**

62.     Bakajin often told Relator to delay submitting government invoices by up to three months, even though he had already prepared them for submittal. The purpose of the delay was to give Bakajin time to review her budgets and make sure the labor allocations met her standard for time allocated to each Government Project.

63.     If the invoices did not comport with Bakajin's allocations, she would instruct Relator to tell employees to revise their timesheets in accordance with Bakajin's "budget" set forth on the Allocation Slip.

64.     Incredibly, she instructed Relator to shred the originals, with which instruction he initially complied, although eventually he began to save them. Relator would then revise the invoices to account for the changes in the labor allocations. This happened throughout the year every six months or so, though more frequently (every 3-4 months) in 2012 when the DARPA grant was within 12 months of ending, and 2015, when the NSF SBIR grant was within 12 months of ending.

65.     In complete contradiction to the Time Keeping Notice, Bakajin was careful to make sure employee's revised timesheets were free of changes or annotations. At some point in 2010, she told Relator she wanted to keep visible changes to a minimum so as to not raise questions from auditors. Bakajin reiterated this point a number of times during Relator's tenure at Porifera.  When she reviewed an employee timesheet, she sometimes asked Relator to give it back to the employee to redo, so that it showed no evidence of alteration.

66.     Sometime in 2012, Relator recommended to Bakajin that Porifera switch to computerized timekeeping. Bakajin refused to make this switch, at first stating that DCAA (Defense Contract Audit Agency) requires they use paper. But on further discussion, Relator realized that Bakajin wanted the flexibility to make changes to the timesheets without an audit trail.

67.     Relator became increasingly concerned with Bakajin's fraudulent actions but could not afford to lose his job by saying something to Bakajin.

**2015-2018: Porifera's Change in Business**

68.     In late 2015, Porifera began selling commercial products. In 2016 Porifera signed an exclusive licensing agreement to perform research and development work for Molson Coors. During the same time period, in 2015-2016, the CEC awarded Porifera $6.7M in grants. By late 2016, Porifera's labor effort trended heavily toward commercial work. Charlie Benton led the engineering team which was focused on providing equipment and services to Molson Coors. The management team focused its attention on increasing commercial sales. The timesheets, however, did not reflect this; rather, billing was heavily skewed toward CEC billing as well as DOE billing, per Bakajin's direction.

///

COMPLAINT

**Increased Fraudulent Billing**

69.     This pattern continued through 2017 and 2018. Bakajin continued reviewing timesheets and directing the employees to revise them to bill time to Government Projects. For example, employee Erik Desomeaux (for the pay period of 4/01/18 to 4/15/18), altered his hours on the CEC Recycler project from 20 to 64. For the time-period 5/16/18 to 5/31/18, employee Peter Laird's hours jumped from 2 to 30 on the CEC Concentrator project. For employee Iljuhn Roh, his hours for the time-period 4/1/18 to 4/15/18 jumped from 0 to 40 on the REC Recycler project. Numerous additional examples, including from Relator himself, exist.

70.     Upon receipt of the revised timesheets from Bakajin, Relator would then revise the invoices he had already prepared for the CEC and DOE.

71.     During this time-period, Porifera's non-government (*i.e.* commercial and internal) activities increased substantially, constituting approximately 85% of employee labor focus. In the third quarter of 2017, Porifera received $7.5M investment funding from the Bao Group, a Chinese State-Owned Enterprise.

72.     In quarters three and four of 2017, Porifera focused most of its energy on moving to the San Leandro location, closing on the Bao Steel Investment, and fulfilling Molson obligations as well as a large commercial order from HY, a South Korean entity.

73.     Porifera employees spent very little time on Government Projects during these quarters. Bakajin, however, misrepresented Porifera's progress to the CEC in her monthly progress reports. Bakajin acknowledged these misrepresentations to Relator and Silvana Shepard in early 2018, as Relator was preparing invoices, but stated that she was not concerned because she was certain Porifera could catch up later.

74.     Relator was extremely uncomfortable with Bakajin's actions, which had become quite overt. Relator believed Bakajin was setting him up as the "fall guy" as he was responsible for signing off and submitting the invoices to the different government agencies.

75.     Due to his discomfort with Bakajin's practices, Relator recommended that Porifera hire a controller, using the investment funding from the Bao Group.

76.     In November 2017, Porifera hired Silvana Shepard, C.P.A. as the controller. Shepard quickly encountered the same issues which Relator had experienced.  Ms. Shepard expressed her concern to Relator on a number of occasions.

77.     Bakajin's manipulation of timesheets accelerated in 2018.  The DOE (P1P2) grant ceased in July 2018.  Two of the CEC grants were scheduled to end in March 2019.

78.     On April 5, 2018, Relator had lunch with Porifera's Board President,  Jensen, to talk about Relator's salary and communicate his concerns about how Bakajin was managing Porifera. Jensen told Relator that he agreed with everything Relator said and the issues Relator raised and promised to talk with Bakajin about them.

79.     In a senior management meeting that took place on May 7, 2018, Bakajin specifically directed Relator, Erik Desomeaux, Charlie Benton, and Jennifer Klare to substantially increase billing to the CEC Recycler project because, according to her, Porifera still needed to bill out over a million dollars to that project. Crucially, Bakajin did not direct the staff to work on the project.  Instead, she directed everyone merely to bill to the CEC projects, and to double spending on the Recycler versus the Concentrator. Notably, Bakajin was well aware that only about $250,000 worth of work was left to be performed on the Recycler project though approximately $1,000,000 of the grant remained for government payout.

COMPLAINT

80.     During this time, Bakajin directed many employees to retroactively change their timesheets to incorrectly indicate more time spent on Government Projects.

81.     On May 23, 2018, Relator called Jensen to follow up on their April 5 meeting. Jensen indicated he had spoken with Bakajin and was surprised she had not followed up with Relator regarding his concerns. Jensen promised to "talk to her again."

82.     Relator interviewed Iljuhn Roh in July 2018.  Relator reviewed Mr. Roh's timesheets going back to January.  Mr. Roh informed Relator that Bakajin had told him what projects to bill time to, and verified that he had not been working on those projects. Moreover, Mr. Roh indicated to Relator that he had been billing based on Bakajin's directions for a long time . Instead, Bakajin directed him on how to fill out his timesheets.  This was all the more remarkable considering that Mr. Roh was in charge of membrane manufacturing production, which was mainly associated with commercial products, and no Government Projects.

83.     When Relator questioned Ravindra Revanur (who reported to Jennifer Klare) regarding his timesheets beginning in January 2018 indicating time spent on the DOE SBIR project, Revanur stated: "[a]ctually that project is not involving anyone. Nobody is working on DOE. I was told by Olgica [Bakajin] and Jen [Klare] to bill for it."

84.     Tristan Nillo (who reported to Jennifer Klare) originally billed his time on indirect (overhead) charges, but around July of 2018, Klare told him to charge his time to the Recycler project.  Similarly, Bakajin told Shepard to bill her time more to the CEC projects, and the Recycler project in particular.

85.     Chris Keith and Charlie Benton also admitted to Relator that Bakajin was having them bill to CEC despite spending little time on CEC projects.

86.     As of 2018, Jennifer Klare was spending at least 90% of her time on commercial customer work yet she increased her billing to the DOE and CEC. Klare instructed her direct reports, Ravindra Revanur and Tristan Nillo, to increase their billing to the DOE and CEC projects as well. This pattern accelerated after the May 7, 2018, meeting.  She directed Relator to revise his March and April timesheets - to increase his Recycler billing and lower his Concentrator billing, and to not bill to CEC DPR Shield "because we can do this later."  Bakajin wanted to bill as much time as possible to the Government Projects that ended earlier, relegating billing to the Government Projects that had a longer life span to later, regardless of on which project the employee was actually working.

87.     Shepard expressed concern to Relator that Bakajin told Shepard to bill a larger share of her time to the CEC Recycler project, even though that did not accurately reflect her time.

88.     Shepard also informed Relator that Bakajin had employees revise additional timesheets, including Adam Sharp (engineer) for June 1-15, 2018 time-period, Ka Ying Lam (intern) for May 15-June 30, 2018 time-periods (she was working on Molson and did no work on Government Projects), Mercedes Thorne (technician) who was a new hire, for the time-period July 1-15, 218, and Peter Laird (engineer) for the time-period May 16-31, 2018.  Bakajin had Kirk Jensen (Board President  Jensen's son and an intern) revise his timesheet from General Activities to the Recycler project from his June 25th start date.

89.     On May 24, 2018, Bakajin brought Relator his prior timesheets and directed him to retroactively change his timesheets, to bill to the CEC a lot more, and at least twice as much to the CEC Recycler project than he had actually worked on it.

90.     In June 2018, Relator learned that as of August 2017, Bakajin stopped signing off on the timesheets, contrary to federal requirements. Relator brought this to Ms. Shepard's attention in early July 2018. Relator told Bakajin that he was unwilling to sign off on invoices that included revised time sheets because she had made changes to the invoices and he was not comfortable with signing them.

91.     Relator submitted his July 1, 2018- July 15, 2018 timeslip to Bakajin.  Bakajin saw that Relator was not complying with her directive that he substantially bill his time to the CEC and was aware that he was not billing the Government Projects in accordance with her directives.

92.     Relator tracked Bakajin's work activities on his personal calendar for a short time period in the summer of 2018. During this time, Bakajin was not spending any time on Government Projects, yet continued to bill DOE and the Recycler Project.

**Retaliation Against Relator**

93.     On July 9, 2018, Bakajin called Relator into her office. On her desk were unsigned invoices Shepard had given Bakajin to sign because Relator did not feel comfortable signing them, believing they contained fraudulent information. Bakajin began the meeting by saying she "wanted to clarify things." She asked Relator to explain his contributions to Porifera. When he finished, she said she would not be giving him a promised raise because she "can't see how you are doing anything more than some of our other employees." Toward the end of the conversation, Bakajin gestured toward the unsigned invoices and asked why Relator asked Shepard to give them to Bakajin. Relator said, "there are changes you made to the invoices and I am not comfortable signing them since I don't know what they were. I think you should sign them." Bakajin pressured Relator to sign them anyway.

94.     Shortly after this meeting, Bakajin started marginalizing Relator at work.  For example, on or about July 10, 2018, Bakajin interviewed Alyssa May, a friend of Charlie Benton, for a marketing position. This was done without Relator's notice and behind his back despite the fact that Relator was in charge of the marketing department and should have been part of the interviewing process.  Also, there was no open position in the marketing department.

95.     Bakajin, Ales Devenica, Klare, and Benton all participated in the interview. Following the interview, Devenica came into Relator's office and asked him why he was not included in the interview as he was in charge of marketing.

96.     On July 11, 2018, Bakajin informed Relator that she had interviewed May.  She further stated that she excluded Relator from the interview because of "where his mind is at."

97.     On July 13, 2018, Devenica informed Relator that Bakajin hired May.

98.     In an effort to further marginalize Relator, after Bakajin hired May (without Relator's input), Bakajin excluded Relator from marketing meetings with May.  For instance, on July 30, 2018, Relator received an email cancelling a scheduled meeting (set for the following day at 10:30) between the three of them.  May informed Relator that she and Bakajin had already met to cover the relevant topics.

99.     Relator confronted Jensen about Bakajin's timesheet billing fraud on July 30, 2018, at which point Mr. Jensen informed Relator that he had discussed everything with Bakajin ahead of time and that Bakajin had told Jensen that everything was "legit."

100.    Because Relator refused to bill the Government Projects improperly and refused to go along with Defendants' fraud, Bakajin terminated Relator on July 30, 2018.

101.    At the time of his wrongful termination, Relator was in possession of approximately 500,000 shares of stock options, representing an approximately 5% stake in

Porifera. Following the termination, Relator was given a 90-day deadline in which to exercise his options, which would have cost him $75,000. He did not have the funds available, and thus he lost the options. Had Defendants not wrongfully terminated him, he would still possess the options, which have a potential significant value which will only be determined upon sale of the company.

## I

### Violation Of The False Claims Act
### 31 U.S.C. §§ 3729, *et seq.*

102.   Relator incorporates herein by reference paragraphs 1 through 101 of the Complaint as though fully set forth herein.

103.   This is a civil action brought by Relator, on behalf of the United States of America against Defendants under the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (2).

104.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, and may still be presenting or causing to be presented, to the United States Bankruptcy Court, false or fraudulent claims for payment, in violation of, *inter alia*, 31 U.S.C. § 3729(a) (1).

105.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, caused, or caused to be used, and may still be using or causing to be used, false or fraudulent records and/or statements to get false or fraudulent claims paid in violation of, *inter alia*, 31 U.S.C. § 3729(a)(2).

106.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information which supported claims to the United States Bankruptcy Court, with actual knowledge of the falsity of the information that supported these claims, caused, and may still be

1  causing, the use of false or fraudulent materials or information to support claims paid by the

2  government.

3      107.    The United States of America, unaware of the falsity of the claims and/or

4  statements made by Defendants and in reliance on the accuracy of these claims and/or

5  statements, paid and may still be paying invoices on the government projects.

6                                        **II.**

7                    Violations of the Federal False Claims Act
8                         (31 U.S.C. § 3729 (a)(1)(B))
9                          Use of False Statements

10     108.    The United States incorporates by reference paragraphs 1-101 as if fully set forth

11 herein.

12     109.    The United States seeks relief against Defendants under Section § 3729(a)(2) of

13 the False Claims Act, 31 U.S.C. 3729(a)(1)(B).

14     110.    Defendants knowingly made, used, or caused to be made or used, false records or

15 statements material to false and fraudulent claims, in connection with the submission of its

16 requests for reimbursement under the Government Health Care Programs.

17     111.    Defendants caused the United States to pay invoices on Government Projects

18 which were not properly charged because of their fraudulent conduct.

19

20     112.    By reason of Defendants' false claims, the United States has been damaged in a

21 substantial amount to be determined at trial.

22                                       **III.**

23                    Violations of the Federal False Claims Act
24                         (31 U.S.C. § 3729 (a)(1)(G))
25                          Use of False Statements

    113.    The United States incorporates by reference paragraphs 1-101 as if fully set forth

26 herein.

27                                        29
28

114.   The United States seeks relief against Defendants under Section § 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

115.   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in connection with the submission of their invoices for reimbursement under the DOE and Department of Defense grant projects.

116.   Defendants caused the United States to pay unearned invoices to Defendants as a result of their fraudulent conduct.

117.   By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### IV.

### Violations of the Federal False Claims Act
### (31 U.S.C. §3730(h)) Retaliation

118.   Relator incorporates by reference paragraphs 1-101 as if fully set forth herein.

119.   Relator seeks relief against Defendants under Section 3730(h) of the False Claims Act.

120.   Relator investigated and advised Defendants of the false and fraudulent claims being presented by Defendants.

121.   Relator's investigation involved matters which were, or were reasonably likely to be, viable actions under the False Claims Act.

122.   Defendants had explicit or implicit knowledge of Relator's protected activity. Defendants were displeased that Relator refused to continue engaging in the fraudulent conduct.

1  123.  Defendants eventually terminated Relator for his actions.

2  124.  By reason of Defendants' acts and conduct, Relator has been damaged in a

3  substantial amount to be determined at trial.

4  **V.**

5  **Violation of the State of California**
   **False Claims Act, California Government Code, Title 2, Div. 3, Part 2, Ch. 6, Article**

6  **9, Section 12651 *Et Seq.***

7  125.  The State of California incorporates by reference paragraphs 1-101 as if fully set

8  forth herein.

9  126.  This is a civil action brought by Relator on behalf of the State of California

10  against Defendants under the State of California False Claims Act, California Government Code,

11  Title 2, Div. 3, Part 2, Ch. 6, Article 9, Section 12651 *Et Seq.* ("CA Federal False Claims Act")

12  127.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

13  the information involved, or with actual knowledge of the falsity of the information, knowingly

14  presented or caused to be presented, and may still be presenting or causing to be presented, a

15  false claim for payment or approval, in violation of CA Federal False Claims Act

16
17

18  128.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

19  the information involved, or with actual knowledge of the falsity of the information, knowingly

20  made, used or caused to be made or used, and may still be making, using or causing to be made

21  or used, false records or statements to get a false claim paid or approved, in violation of CA

22  Federal False Claims Act.

23  129.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

24  the information involved, or with actual knowledge of the falsity of the information, knowingly

25  made, used, or caused to be made or used, and may still be making, using or causing to be made

26
27  31

28  COMPLAINT

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California or one of its political subdivisions, in violation of CA Federal False Claims Act.

130.     The State of California, or its political subdivisions, unaware of the falsity of Defendants' claims and/or statements, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for work not performed in conjunction with State grants.

131.     Had the State of California known that services were not performed as invoiced, California would not have paid those claims.

132.     As a result of Defendants' actions, as set forth above, the State of California or its political subdivisions have been, and may continue to be, severely damaged in an amount to be determined at trial.

133.     By reason of Defendants' acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

**VI.**

**Violations of the California State False Claims Act (CA Federal False Claims Act §12653)**
**Retaliation**

134.     Relator incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

135.     Defendants violated section 12653 of the California State False Claims Act.

136.     Defendants intentionally retaliated against Relator by terminating him for refusing to engage in the fraudulent behavior, and for notifying Defendants of his refusal to do so.

137.    By reason of Defendants' acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

## VII.

### Violations of the California State Labor Code section 1102.5 Retaliation

138.    Relator incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

139.    Defendants violated sections 1102.5(b) and (c) of the California Labor Code which prohibits retaliation against an employee who engages in protected activity.

140.    Relator contends his actions detailed above, including disclosing information he reasonably believed violated federal and state statutes, and regulations, and his refusal to participate in activities that would result in a violation of, or noncompliance with, federal or state and statutes and regulations constituted protected activity under California Labor Code section 1102.5, and that such protected activity was a substantial contributing factor in Porifera's retaliatory decision to terminate his employment.

141.    As a direct, proximate, and foreseeable result of Porifera's violations of Labor Code section 1102.5, Relator has suffered and will continue to suffer emotional distress, economic loss, and substantial losses in earnings and other employment benefits, including lost earning capacity. Relator would not have suffered these losses but for Defendants' unlawful conduct.

142.    By reason of Defendants' acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

///

33

COMPLAINT

# VIII.

## <u>Wrongful Termination in Violation of Public Policy</u>

143.    Relator incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

144.    Defendants' actions in terminating Relator under the circumstances alleged above violate the fundamental public policies in California and federal law, embodied, among elsewhere in: California Labor Code section 1102.5; the CA Federal False Claims Act §12653; and the Federal False Claims Act.

145.    Relator's protected activity, including refusal to participate in activities that would result in a violation of, or noncompliance with, federal and state statutes and regulations were substantial motivating reasons for his termination, and caused him harm.

146.    As a direct, proximate, and foreseeable result of Defendants' wrongful termination in violation of public policies, Relator has suffered and will continue to suffer emotional distress, economic loss, and substantial losses in earnings and other employment benefits, including lost earning capacity and the right to receive and exercise stock options. Relator would not have suffered these losses but for Defendants' unlawful conduct.

147.    By reason of Defendants' acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

COMPLAINT

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, the United States and the State of California, *ex rel.* JEFFREY MENDELSSOHN request that judgment be entered in their favor and against Defendants as follows:

(a)    On the First, Second and Third Claims for relief (Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a) (1)) for treble the United States' damages, in an amount to be determined at trial, and an $21,562.80 penalty for each false claim presented;

(b)    On the First, Second and Third Claims for relief, awarding Relator his relator's share pursuant to 31 U.S.C. § 3730(d);

(c)    On the First, Second, and Third Claims for Relief, an award of costs and attorney's fees to Relator pursuant to 31 U.S.C. § 3730(d);

(d)    On the Fourth Claim for Relief, awarding Relator such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including:

        (1)    two times the amount of back pay with appropriate interest including pre- and post-judgment interest;

        (2)    compensation for special damages, including damages for emotional distress, sustained by Relator in an amount to be determined at trial;

        (3)    litigation costs and reasonable attorney's fees; and

        (4)    such punitive damages as may be awarded under applicable law,

(e)    On the Fifth Claim for Relief, (Violations of the California State False Claims Act, §12651), for treble the State of California's damages, in an amount to be determined at trial, and a $550-11,000 penalty for each false claim presented;

(f)    On the Fifth Claim for Relief, awarding Relator the relator's share pursuant to CA FAC §12650 *et seq.*;

(g)     On the Fifth Claim for Relief, an award of costs and attorneys' fees to Relator pursuant to CA FAC §12650 *et seq.*;

(h)     On the Sixth Claim for Relief, awarding Relator such relief is appropriate under CA FAC §12650 *et seq* for retaliatory discharge, including:

      (1)     two times the amount of back pay with appropriate interest including pre- and post-judgment interest;

      (2)     compensation for special damages, including damages for emotional distress, sustained by Relator in an amount to be determined at trial;

      (3)     litigation costs and reasonable attorney's fees; and

      (4)     such punitive damages as may be awarded under applicable law,

(i)     On the Seventh and Eighth Claims for Relief, for:

      (1)     compensatory damages for wage and benefit losses, including compensation for the right to receive and exercise stock options;

      (2)     emotional distress, according to proof as allowed by law;

      (3)     reinstatement, or front pay and benefit loss in lieu of reinstatement;

      (4)     punitive damages, according to proof and as allowed by law;

      (5)     an award to Relator/Plaintiff of his attorneys' fees and costs pursuant to Government Code section 2699.3; Code of Civil Procedure section 1021.5, and any other applicable statute;

      (6)     an award to Relator of costs of his lawsuit;

///

///

///

///

///

        (7)     an award of prejudgment and post-judgment interest; and

(j)     Awarding such further relief as is proper.

Dated: February 11, 2019

                                        EMILY NUGENT LAW


                                        By: _____
                                        Emily Nugent

                                        Emily Nugent Law
                                        935 Moraga Road, #200
                                        Lafayette, CA 94549
                                        emily@emilynugentlaw.com
                                        510-371-4456


                                        -and-

                                        FISCHER LEGAL GROUP
                                        Andrea Fischer (*pro hac* pending)
                                        Audrey Schechter (*pro hac* pending)

                                        1740 Broadway
                                        Suite 1500
                                        New York, NY 10019
                                        T: 212-328-0142

                                        *Attorneys for Relator*

COMPLAINT

**JURY TRIAL IS DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

Dated: February 11, 2019

                                        EMILY NUGENT LAW

                                        By: _____
                                        Emily Nugent

                                        Emily Nugent Law
                                        935 Moraga Road, #200
                                        Lafayette, CA 94549
                                        emily@emilynugentlaw.com
                                        510-371-4456


                                        -and-

                                        FISCHER LEGAL GROUP
                                        Andrea Fischer (*pro hac* pending)
                                        Audrey Schechter (*pro hac* pending)

                                        1740 Broadway
                                        Suite 1500
                                        New York, NY 10019
                                        T: 212-328-0142

                                        *Attorneys for Relator*

COMPLAINT